## Penny v. McRoberts.

(Decided March 3, 1915.)

Appeal from Lincoln Circuit Court.

1. Elections—Voter—Eligibility.—A person is not eligible to vote in any minor subdivision of a county, when he has resided

therein for sixty days, unless he has, also, resided in the state for one year, and in the county, in which said minor subdivision is, for six months preceding the election.

2.  Schools and School Districts—Annexation of Territory—Jurisdiction.—Since the enactment of Section 4664b, Kentucky Statutes; and Subdivisions 1, 2, 3 and 4, the county courts have no jurisdiction to make changes, which add additional territory, in the boundaries of the graded common school districts.

3.  Schools and School Districts—Annexation of Territory.—Since the enactment of Section 4664b, Kentucky Statutes, the board of trustees of graded common school districts have authority to add additional territory to the district, but their proceedings to have any validity must be evidenced by records of such proceedings, properly made and entered upon the record book of the proceedings of such board of trustees.

4.  Elections—Voting Place.—A citizen cannot select for himself a voting place other than the place the law constitutes his legal home and habitation.

5.  Domicile—Elections—Voting Place.—The place where a person's habitation is, and to which he has the intention of returning when away, is deemed his residence for the purpose of fixing his voting residence.

6.  Elections—Voter—Clerk Recording Wrong Name—Effect of.—Where a person is a legal voter, and the clerk of the election, by mistake, records his vote under a name other than his true name, it does not deprive such person of his vote, or render his vote properly cast by him, as illegal.

7.  Schools and School Districts—Viva Voce Elections.—When the General Assembly provided that elections of school trustees should be held viva voce, it is to be presumed, that it was intended that it should be done, so far as the manner of casting and receiving the votes, in accordance with the rules governing viva voce elections, which were so long in force in this State.

8.  Schools and School Districts—Viva Voce Elections.—According to the viva voce system, so long in force in this State, the voter must come into the immediate presence of the officers of the election, and with his own voice declare his choice of candidates.

9.  Elections—Viva Voce Voting.—To be in the immediate presence of the officers of the election, means that the voter must be immediately at the place where the officers of the election are situated, so that each of them may hear the declaration of the voter; and the clerk of the election, whose duty it is to record the vote, may have his information as to the voter's name and desire from the voter himself, and the voter can see, if he desires to do so, how the vote is recorded, and the judges may see, also, that it is recorded in accordance with the wishes of the voter.

10. Elections—Viva Voce Elections.—At a viva voce election the voter must personally and publicly vote, in the immediate presence of the officers of the election.

11. Elections—Viva Voce Elections—Manner of Voting.—At a viva voce election, neither of the officers of the election can lawfully receive his information, as to the name of the voter, or the choice of the voter as to candidates, from any other source than from the voter himself, and at the time the voter is proposing to exercise his right of suffrage.

GEORGE D. FLORENCE and ROBERT HARDING for appellant.

J. N. MENEFEE, J. BRIGGS, K. SUMMERS, J. SAM OWSLEY, JR., J. N. SAUNDERS and THOMAS J. HILL for appellee.

OPINION OF THE COURT BY JUDGE HURT—Reversing.

On the 2nd day of May, 1914, an election was held in the Stanford Graded Common School District for the election of two trustees. The candidates voted for were W. B. O'Bannon, George L. Penny and P. M. McRoberts. The returns, as certified by the officers of the election, showed that W. B. O'Bannon received 337 votes, and was duly elected one of the trustees. The same returns showed that Penny had received 177 votes and McRoberts 175. The above result was certified by the officers of the election to the board of trustees of the district.

In due time P. M. McRoberts, the appellee, filed a petition alleging that he had received a majority of the legal votes cast, and was duly elected trustee, and contesting the votes of fifteen persons, who had voted for the appellant, Penny, and whose votes had been received and counted, and were included in the 177 votes which were certified as having been received by Penny. These persons were Mrs. Walter Carman, Mrs. Grover Hester, Stevenson Dozier, W. G. Smith, Manly McGuffy, Lee Wilder, Mike Penny, Jack Goode, J. W. Brackett, W. R. McCarley, Mrs. W. R. McCarley, John Chappell, C. P. Anderson, Walter Warren, and James Engleman.

The appellee thus claimed that he had received 175 legal votes, and the appellant, Penny, had received only 162 of the legal votes, but, although this was true, the board of trustees had declared the election of Penny.

In due time the appellant, Penny, filed his answer and counter-claim, in which he traversed the allegations of the petition with regard to the illegality of the fifteen votes mentioned in the petition, and, in his counter-claim, alleged that of the 175 votes which were cast and counted for the appellee twenty-nine of said votes, to-wit, the

votes of Mike Long, Marion Fields, J. H. Baughman, J. S. Fisher, George W. Carter, Mattie Carter, Annie Carter, Walter Carman, A. C. Carman, Mrs. George De-Borde, Mrs. H. D. Phillips, Mrs. Bettie Barnett, Miss Annie Lunsford, Miss Sallie Eubank, Mrs. Bettie Mc-Kinney, Mrs. W. M. Bright, Mrs. E. D. Kennedy, Miss Minnie Woods, Mrs. W. K. Warner, Miss Lizzie Beazley, Mrs. R. C. Warren, Mrs. J. C. Osbourne, Miss Bell Denny, Ida Holtzslaw, J. A. Walter, Mrs. J. A. Walter, Mrs. Lucy H. Beazley, D. T. Brummett, and J. H. Greer, were illegal, and that the votes of neither of the said persons should have been counted for the appellee, and upon the whole, that he had received 177 votes, and that the appellee had only received 146 legal votes. The affirmative allegations in the answer were controverted by reply.

Upon the calling of the case for trial the appellant admitted of record that Mike Penny and Stevenson Dozier were under twenty-one years of age at the time they voted, and for that reason were illegal voters, and the appellee admitted of record that the vote of Mrs. J. C. Osbourne was an illegal vote, and improperly counted for him. Of the votes contested by the appellee, proof was taken and heard as to the votes of Mrs. Walter Carman, Mrs. Grover Hester, Manly McGuffy, Lee Wilder, Jack Goode, J. W. Brackett, John Chappell, W. G. Smith and James Engleman. Of these the circuit court adjudged that Mrs. Walter Carman, Mrs. Grover Hester, Manly McGuffy, Lee Wilder, Jack Goode and W. G. Smith were not legal voters and that their votes were improperly received and counted for the appellant, and of this the appellant makes complaint.

The husband of Mrs. Carman and she herself testified that she was only nineteen years of age at the time she cast her vote, and that they received this information from the parents of Mrs. Carman, and in the family, and we think there can be no doubt upon that subject.

The only proof taken as to Mrs. Grover Hester's right to vote was the deposition of her father, William Sprinkles, who testified that she was only seventeen years of age. Upon cross-examination it was shown that the date of her birth had been recorded in the family bible by the mother of Mrs. Hester, which bible the witness, Sprinkles, offered to produce, if requested, but no request was made for it to be done by the appellant, and

the judgment of the circuit court was correct in adjudging her not to be a legal voter.

The vote of Manly McGuffy was contested upon the ground that he had not been a resident of the district for sixty days preceding the election, and upon that subject he testified without reservation, that he had moved his place 'of residence from a point which was outside of the district, and became a resident of the district on the second Monday of March preceding the election, and moved his family into the district on the following Saturday. This statement of his is not contradicted seriously by any convincing proof, and the court did not err in holding that he was without right to vote.

The vote cast by Lee Wilder was contested upon the ground that he had not been a resident of the district for sixty days preceding the election. The only proof upon that subject was the deposition of W. P. Kincaid and A. T. Wilder, both of whom testified that Lee Wilder became a resident of the district after the 10th day of March preceding the election. The failure to offer Wilder himself as a witness as to his right to vote is significant, and the vote cast by him was properly adjudged to be an illegal vote.

The vote cast by W. G. Smith was contested upon the ground that while he had been a resident of the district for sixty days previous to the election, he had not been a resident of the county for six months previous to the election.

The contention of appellant that in as much as the common school law, Chap. 25, Section 2, Session Acts 1912, prescribes the qualifications of a voter in an election for school trustee to be a male person, twenty-one years of age, and a resident of the district sixty days preceding the election, would entitle any person to vote who had resided as much as sixty days in the district, regardless of any other qualifications, is not well grounded. The constitution, Section 145, and Section 1439 of Kentucky Statutes provide that the qualifications of a voter shall be a residence in the State for one year, and in the county for six months, and in the precinct in which he offers to vote for sixty days preceding the election. While school trustees are not officers provided for in the Constitution, they are officers provided for by the statutes of the State, and the well known evils which the provisions in the Constitution and in the

statutes were intended to provide against would be permitted by holding that a person not having resided a year in the State, and in the county six months, could vote in the election for school trustees. These provisions are intended to apply to transient persons, having no fixed habitation nor interest in the country, from exercising influence in its control and management; and for the further purpose of preventing persons from being located in particular districts of the community, in order to carry out designs contrary to the wishes of the inhabitants of the community. The section of the common school law, *supra,* does not provide that any person may vote who has not the qualifications prescribed by Section 1439, *supra,* of the Kentucky Statutes. In no state of case can any person vote in any minor subdivision of a county, by reason of having resided therein sixty days, unless he, also, has resided in the State for one year, and in the county in which the sub-division is for as much time as six months previous to the election. Trustees, et al. v. Stone, et al., 142 Ky., 715.

The court did not err in holding the vote of Smith to be an illegal one.

As to the vote received and counted for the appellant, as having been cast by James Engleman, we think that the proof shows that this vote was cast by John Engleman, Sr., and that by mistake of the clerk he erroneously recorded the name of the voter as James Engleman. The contention that this vote ought not to be counted as the vote of John Engleman because the poll sheet shows that one John Engleman did vote, and that it was recorded as such, is not well taken, because the evidence fails to show that there was only one John Engleman in the district, and, in fact, shows that there were two, and further, the vote of John Engleman which is recorded as such upon the poll sheet was not contested by the appellee. The court did not err in holding that this vote should be counted for appellant.

The votes of Jack Goode, J. H. Chappell and J. W. Brackett for appellant were contested upon the ground that neither of these citizens were residents of the district at the time they voted. There is no contention that they were not otherwise legal voters. It appears that the places of their respective residences were not within the boundaries of the original district, as established in 1901, and, unless by some change of the district, they

have since been included, the contention of appellee must be sustained. The record shows that at some time or other, the date does not appear, that J. T. Peyton and Mary Craig filed a petition in the county court asking that certain territory therein described be included in the district. This petition was never acted upon by the county court and no order ever made with reference to it. The mere filing of the petition could not effect any change in the boundary. J. M. Meadows filed a petition in the county court in the year 1908, asking that a certain boundary described therein be added to the district, and on May 8th, 1908, a judgment was entered by the county court, according to the prayer of the petition, and adding territory which the proof shows would probably include the residence of Jack Goode. The proceeding, however, was had after the enactment of Section 4464b and Sub-sections one, two, three and four, of Kentucky Statutes, which authorized the trustees of a graded common school, who desired to add territory to the district, to do so, by and with the consent of a majority of the legal voters residing in the proposed territory to be added. The county court, at that time, had no jurisdiction authorizing it to add to the territory of the district, and this proceeding was void and of no legal effect. At some time, the record does not show when, L. R. Hughes, Allen Traylor and W. L. McCarty filed a petition in the county court, praying a change in the boundary and adding to the district a certain described territory, but this was never carried to judgment, and no order was ever made in reference to it. This proceeding could not have added any additional territory. Since the enactment of Section 4464b, *supra,* the trustees, as therein directed, had authority to add territory to the district, but their proceedings to do so would have to be manifested by orders made and entered upon the record book of the proceedings of the board of trustees, but no such records are shown or relied upon.

On the 30th day of January, 1904, Mrs. Martha Hampton, Mrs. Annie Scurvis, Nancy J. Oaks and Mary F. Flannigan filed a petition in the county court, asking that the houses and lots owned by them be added to the graded common school district. This petition had the approval of the county superintendent of schools, the trustees of the school district in which the peti-

tioners then resided, and the board of trustees of the graded common school district. It appears that two years had intervened at the time of this application since the original establishment of the graded common school district, and the petition alleged that it was made by legal voters and the owners of real estate sought to be transferred, in the district in which they then resided. These are the jurisdictional facts necessary to give the county court jurisdiction, and to authorize it to make the change in the district boundary prayed for, and the presumption must be indulged that these facts existed, as the county court granted the relief sought, and entered an order adding the territory to the district, describing it by metes and bounds, and ordered that the territory described in the petition, and the territory already included in the graded common school district should thereafter constitute the district. This seems to have been a substantial compliance with the requirements of the statute. This seems to have been the only valid change made in the district since its original establishment, and the proof shows that Chappell and Brackett resided upon lands which were added to the district by the last mentioned proceeding, and Goode does not so reside. The honest belief of Goode that he was a resident of the district does not authorize him to vote, in the absence of any authority of law making him a voter. For these reasons the trial court was not in error when it held Chappell and Brackett to be legal voters, and Goode not to be a legal voter. No reason was shown why W. R. McCarley and Mrs. W. R. McCarley, C. P. Anderson and Walter Warren were not legal voters.

Annie Lunsford voted for appellee and her right to vote is contested. It appears from her own deposition that about the first of October, 1913, she went to the home of one Higgins, within the district, for the purpose of nursing an invalid. She remained there until the death of the invalid, which was about the first of May, 1914; that she left that point and went to Danville, and stayed three weeks, and then to the home of her brother-in-law, Holderman, at a point outside of the district. She states that she did not consider the home of Higgins as her home, but all the time considered her home to be at Holderman's, and was at Higgins' for a mere temporary purpose, and we do not think from the

proof she was a resident of the district, within the meaning of the law, and was not entitled to cast a vote.

Sallie Eubank, also, voted for appellee, and her vote was contested upon the ground that she was not a resident of the district, and the court below so held. It appears that she is an unmarried woman, and without any family of her own, but that she has been residing at the house of one Beazley, within the district, for three years and six months previous to the election; that she was employed as a servant, and while she does state that she expected to return to the home of her brother at Houstonville when she had no further employment at Beazley's, that statement and intention is only to be regarded as the intention of one, who, when he has lost his home at the place where he is, will seek another somewhere else. Her habitation for all purposes was within the district. Considering the length of time she has continuously resided in the district, and, under the circumstances surrounding her, we are of the opinion that she was a legal voter, and the court erred in holding otherwise.

George W. Carter and his two daughters, Annie Carter and Mattie Carter, voted for appellee, and their votes are contested upon the ground that they were not residents of the district in the meaning of the law governing the right of suffrage. Upon what ground the right of Annie Carter and Mattie Carter to vote is assailed is right hard to conceive. They lived at their father's home, within the boundary of the district, and had so resided for seven years last past, and no act of any kind of theirs is shown which indicates in any way that their father's house was not their home. The court below held that they were legal voters, and we concur in its opinion. As to G. W. Carter, it appears that he owned a farm within the district, upon which he had lived for seven years preceding the election; that said place was his home for all of the purposes for which men have homes, and that he resided there continuously. It, however, appears that he had been in the habit of going to Turnersville precinct and voting there at the elections held for the State and county, but upon what ground he could possibly have a right to vote at Turnersville is not apparent. While he owned some property which was situated within the Turnersville precinct, when he removed to the graded school district, he did.

not even move from the Turnersville precinct, but from another point. The ownership of property gives no one any right of suffrage in a district wherein the property is situated. A citizen has no right to select a voting place for himself, other than his legal home and place of residence. When a man resides at a certain place and upon property of his own, and is called upon and performs all the duties of a citizen in that place, and when he is away from home, goes with the intention of returning to that place, he has no right by merely claiming a right to vote at some other place to cast his suffrage at such place. Section 1478, Sub-section 1, Kentucky Statutes, enacting rules for determining the residence of one offering to vote provides: ''That shall be deemed his residence where his habitation is, and to which, when absent, he has the intention of returning.''

It is very clear that G. W. Carter had not even the slightest claim of a right to vote at Turnersville, but we do not think that his illegally voting there would prevent a lawful vote from him from being received and counted in a district where he had a legal right under the laws to exercise his suffrage. For these reasons the court below was not in error in holding him to be a legal voter in the Stanford Graded School District.

The votes cast for appellee and counted for him under the names of Mike Long, J. H. Baughman, Mrs. George DeBorde, and Mrs. H. D. Phillips, all of which were contested upon the ground that these persons did not vote for him, were properly received and counted for him.

It appears that Mrs. George DeBorde did not vote, but that Mrs. Maggie DeBorde, who had a legal right, did vote for appellee, and the clerk of the election, by mistake, wrote her name Mrs. George DeBorde.

Mrs. H. D. Phillips did not vote for appellee, but Mrs. Martha Phillips, who was a voter, voted for appellee, and the clerk, by mistake, recorded her name as Mrs. H. D. Phillips.

J. H. Baughman did not vote, but J. S. Baughman, who was a voter, did vote for appellee, and the clerk, by mistake, wrote his name J. H. Baughman, instead of J. S. Baughman.

Mike Long did not vote, but Frank Long, who was a voter, did vote for appellee, and the clerk, by the same kind of mistake as above, wrote his name Mike Long.

These facts seem to be clearly established, and the mistake of the clerk in recording their names, where such mistake is clearly shown, ought not to deprive the voters of their right of suffrage, nor deprive the appellee of their votes.

J. S. Fisher, whose vote was contested, was a legal voter, and voted for both appellant and appellee.

The proof shows that Walter Carman was a legal voter and voted for both appellant and appellee.

The vote of Marion Fields was contested upon the ground that he had not been a resident of the district for sixty days preceding the election. He was a resident of Lincoln County, and had been previous thereto for a good many years, and he testifies that he came to Stanford on the first day of January preceding the election with the intention of making it his permanent home, and had resided there continuously ever since; that a portion of the time he had been engaged in the business of a butcher, and the remainder of the time had worked in a restaurant, and had made his habitation there since January first. There is no convincing proof to the contrary, and the court did not err in holding him to be a legal voter.

Miss Bell Denny, whose vote was contested upon the ground that she did not reside within the district, testified that she had resided there continuously since the year 1907, and there is no proof to the contrary, which would seem to legally entitle her to vote.

The vote of J. H. Greer was contested upon the ground that he had not resided in the State for one year previous to the election. It appears that he went to Detroit and worked six months during the year 1913; that he went for the purpose of seeing his son, who resided there, and with the intention of returning after a temporary sojourn there, and that he returned previous to the election in the fall of 1913 and voted at that time; and that he owns a house and lot in Stanford, where he had resided for several years, and where he left his wife and daughters while he was gone.

Sub-section 5, of Section 1478, Kentucky Statutes, seems to apply to the facts of this case, and we think he was legally entitled to vote.

The vote cast by Miss Lizzie Beazley was contested upon the ground that she did not reside within the district. It appears from the proof that she was a teacher,

teaching in one of the counties of Kentucky, but spends
her vacations in Stanford; that she owns a house and lot
in Stanford, and has for several years; that she rented
it last October, but retained a room in the house in which
to store her furniture and belongings, and she states
that she had made her home in Stanford for forty years
last past, and also claimed to live there, and regarded
it as her home; that it is the place to which she has in-
tention of returning when away; and that when in Stan-
ford she makes her place of stopping at the home of a
relative of hers; that shortly previous to the election
she had been visiting her sister at Moreland, but that
the visit was a temporary sojourn with her sister. The
court below held that she was a legal voter, and we con-
cur in the opinion.

The court below adjudged that the vote of Mrs. J. A.
Walters was properly received and counted for appellee,
and there does not appear any reason why it should not
have been.

The votes cast by Mrs. R. C. Warren, Miss Minnie
Woods, Mrs. W. M. Bright, Mrs. E. D. Kennedy, Mrs.
W. K. Warner, Mrs. Bettie Barnett, and Mrs. Bettie
McKinney were contested upon the ground that their
votes were not personally cast by either of them, but
were received and recorded by the officers of the elec-
tion for appellee, and the information as to how they de-
sired to vote was received by the officers of the election
from persons other than the voter.

As to the manner of voting, where the voting is done
viva voce, although it was the old system in this State,
and the election of school trustees, and the vote taken
for the levying of a tax for the establishment of a graded
common school are vestiges of the system yet remaining,
there is a great dearth of authority, arising, doubtless,
from the fact that the simple machinery of elections held
viva voce gives small opportunity for controversies
about the manner in which the votes ought to be received
and recorded. Our present Constitution, Section 147,
provides that all elections by the people shall be by se-
cret official ballot, but Section 155 provides that this
provision shall not apply to the election of school trus-
tees, and other common school district elections, but
that the elections shall be regulated by the General As-
sembly, except as otherwise provided in the Constitu-
tion. The General Assembly has provided that the elec-

tions for school trustees shall be according to the viva voce system. Chapter 25, Session Acts 1912. The section referred to provides as follows:

"All elections for school trustees shall be by viva voce vote. The officers of the election shall be two judges and a clerk. * * * The said officers shall be the judges of the qualifications of each voter. * * *"

It is to be presumed that the legislative authority, when it enacted the statute, *supra*, had in view and intended to put into force the well-known viva voce system, as to the manner of casting and receiving the legal votes, which had been so long in use in this State, until almost every voter was acquainted with it.

The second Constitution of this State, which went fully into effect on June 1st, 1800, by Art. VI., Section 16, provided that, "In all elections by the people . * * * the votes shall be personally and publicly given viva voce." This continued to be the constitutional requirement regarding this manner of voting until the adoption of the third Constitution of this State, in the year 1850. The same provision was incorporated in the Constitution of 1850 by Art. VIII., Section 15, with the proviso that deaf and dumb persons might vote by ballot. This continued to be the law until the adoption of the present Constitution in 1892. The only legislative expression as to the manner of voting under this system seems to have been embodied in an act of the General Assembly which went into force on January 1st, 1800, and which provided that: "The persons entitled to suffrage shall, in the presence of said judges and sheriff, vote personally and publicly, viva voce." This legislative enactment, and the provisions of the Constitution, *supra*, were construed by the officers holding the elections, and by the voters exercising the right of suffrage under these provisions for nearly a century. The construction invariably placed upon the provisions of the Constitutions of 1799 and 1849, and the act of 1799, *supra*, and the other acts of the General Assembly relating to elections, was that the person entitled to vote must come in person, into the immediate presence of the officers of the election, and with his own voice declare his choice as between candidates. The immediate presence of the officers of the election has been in the same way construed to mean to be immediately at the place where the officers conducting the election are situated, so that each

of them may hear the declaration of the voter, and so that the clerk may receive his information as to the choice of the voter from the voter himself, and thus know from the voter himself his name, as well as how he desires to vote, in order that the clerk may be able to record the vote from information at first hand, and so that the voter may, if he desires, see that the clerk records his vote in accordance with his wishes. Neither the clerk nor the judges of the election should be required or allowed to obtain the name, or the wishes of any voter, as to how he desires to vote, from any other source than the voter himself, except in the case of deaf or dumb voters, for the purpose of recording the vote. The reasons for the enforcement of the above requirements are very obvious. It is the province of the judges to determine the qualifications of the voter, but it is the duty of the clerk to record the vote. For the information to be imparted to the judge alone as to the wish of a voter would compel the clerk to make his record from second-hand information, and if the wish of the voter is imparted to the clerk alone, the judges would have no opportunity to determine the qualifications of the voter, and the by-standers watching the conduct of the election would have no opportunity to make protest against wrongs. For the officers of the election, or any one of them, to receive and record a vote upon information from any person, other than the voter himself, as to his desire to vote and his choice, however near the proposed voter might be to the polling place, would dispense with the necessity of voters coming in person to the polling place at all. While in the instant case it is not intended that it should be inferred that either the officers of the election or the voters were guilty of any intentional wrongs, this court could not give sanction to a method of voting which, if of general application, would necessarily result in conducting viva voce elections in such a loose and unsatisfactory manner that it would produce general dissatisfaction in the results of such elections, and bring them into general disrepute.

Applying the above stated principles we are of the opinion that the court did not err in adjudging that the votes cast by Mrs. Bettie Barnett and Mrs. Bettie McKinney were properly received and recorded for appellee, and that the vote recorded as that of Miss Minnie Woods was properly disallowed. For the same rea-

sons we think the court was in error in holding that the votes recorded for appellee as the votes of Mrs. R. C. Warren, Mrs. W. M. Bright, Mrs. E. D. Kennedy, and Mrs. W. K. Warner were properly received and recorded. No reasons are assigned for contesting the votes cast by A. C. Carman, Idà Holtzclaw, Lucy H. Beazley and D. T. Brummett, and they appear to be legal voters. No one cast any vote in the name of J. A. Walter and no vote is recorded in his name.

It, therefore, appears that, upon the whole case, the appellant received 169 legal votes for the office of school trustee, and for the same office the appellee received 168 legal votes.

The judgment appealed from is, therefore, reversed, and the case is remanded to the court below, with directions to enter a judgment declaring the appellant to have been duly elected trustee and to dismiss the petition.