## Everman v. Thomas.

June 14, 1946.

As Extended on Denial of Rehearing

October 25, 1946.

162

Shumate & Shumate for appellant.

Reid Prewitt and H. C. Hadden for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

On the face of the returns from the November, 1945, election, D. S. Thomas, Democrat, was elected County Judge of Powell County over J. C. Everman, Republican, by a majority of 20 votes, their totals being 883 and 863, respectively. A contest was filed in which it was charged that Thomas had received a number of illegal votes, the names of the voters being set out. The contestee responded with a traverse and affirmative allegations that the contestant had profited by many illegal votes, the names of those voters being listed. A Special Judge heard the evidence orally and found the contestee to have been elected by a majority of 9 votes. The case is here on appeal.

With negligible exceptions, the illegality of the votes is based upon the claim that they were cast (1) by persons who had not lived in the precinct the statutory period of time, and (2) had openly voted without being sworn as to an infirmity. The contestant claims that the trial court committed errors in deducting certain votes from his total and in declining to deduct certain votes from the total of his opponent. On the other side the contestee has the same complaint, vice versa.

In our approach to the examination of the voters questioned because of residence, we take note of Section 145 of the Constitution and KRS 117.010, which requires that one who is otherwise qualified to vote must have resided in the State one year, in the County six months, and in the precinct 60 days next preceding the election. Also the rules which the Legislature has laid down in

KRS 117.020 for determining residence as construed in Matney v. Elswick, 242 Ky. 183, 45 S. W. 2d 1046, 1047, as follows:

"Under these rules, a citizen cannot select for himself a voting place other than the place the law constitutes his legal home and habitation. Penny v. McRoberts, 163 Ky. 313, 173 S. W. 786. If he actually lives in one district, he cannot vote in another, unless he resides in the former merely for a temporary purpose. Though he may have a home, or own property in the district, yet, if he leaves there, and takes up an actual residence elsewhere with the intention of remaining there indefinitely, he becomes a legal voter at the place where he lives, and cannot vote at his former home. In each case the facts must control, and not what the voter says about being absent for a temporary purpose. Thus, where one who leaves his home and establishes a home elsewhere, not for the purpose of performing a particular service, or of doing a particular job for another, or engaging in business for a limited time, but with the purpose of engaging in business or obtaining employment for an indefinite period, and remains away for two or three years, and does not return except for the purpose of voting, it cannot be said that he was absent for a temporary purpose."

In case of doubt as to a voter's residence, it is resolved in favor of the permanency of residence in the precinct where he votes. 29 C. J. S., Elections, sec. 19.

## I.

1. We first consider votes which the appellant claims the court erroneously declined to deduct from the total returned for the contestee, Thomas, because they were not legal voters in their respective precincts.

(a) O. D. Snowden, wife and daughter voted in Precinct No. 2. They had lived there until Snowden sold his home in April or May, 1945, and took up his abode with another daughter in another precinct until they could acquire another home, which they had always intended to do in their own precinct. They left most of their furniture stored in No. 2, and testified they had moved out only temporarily. In July, 1945, he bought a lot and a residence was in process of erection on election day. It was completed about a month later and the

family moved into it. We concur with the finding that these were legal voters in No. 2.

(b) O. P. Cunningham and wife were tenants in No. 2 and were required to vacate the premises by November 1st. They left on the 2nd taking with them some of their furniture into a house in No. 9, where they slept. It appears they still had possession of the property in No. 2 and had not completely changed their legal residence on election day. Louis Rogers and wife occupied a similar status. They had moved part of their things the day before the election, stayed that night with a relative and completed their moving afterward. It was held in Silver v. Brown, 215 Ky. 199, at 210, 244 S. W. 997, at 1002, that one in process of moving into a new home on the day of election is entitled to vote in the precinct where he had been living. So it is here.

(c) Ernest Hensley and his children had been living with his father in No. 8 when he went into the Navy. While he was in the service his father sold his property and he and his family moved into another precinct. When he returned from service he went to his father's home and never afterward lived in No. 8, where he voted. We differ with the trial court and hold that this man had lost his right to vote in No. 8, and the vote should have been deducted from Thomas's total, as he had voted for him.

(d) Doyle Lyle and wife were farm tenants in No. 6 where they had lived all their lives. During the year 1945 he cultivated other land belonging to the same landlord, and for convenience had temporarily moved into a house in Clay City. It was his purpose and that of his landlord that he would return to No. 6 when he had completed the crop. He had left some of his furniture in the house in that precinct and it had remained unoccupied. They were entitled to vote there.

(e) It is so clear that Elizabeth Easter and Jasper Spangler and wife were absent from their home precincts only temporarily and were entitled to vote there, that discussion is unnecessary.

2. We now consider votes of persons who voted openly or across the table without having been sworn as to an infirmity which would have permitted that method

of voting had an oath regarding their conditions been administered. KRS 118.300.

(f) Matilda Spencer and May Spencer were charged by the appellant as having openly voted for the contestee, and he charged they had voted for the contestant. The evidence of the two women and that of the election officers is so contradictory and confusing that no one can tell for whom either voted. The court charged them up to the appellant. They should not have been charged to either party because of failure of proof.

(g) The evidence as to how Russell Powell, Everett Ledford and Mary Powell voted is also too confusing and contradictory to justify deduction from either party, and the court did not do so.

(h) The court refused to deduct a vote from Thomas on account of open voting of H. Hatton. Although he testified specifically that he had voted for Thomas, he could not say that the officer had marked his vote that way as he had asked or told him to do. The presumption is that the officer performed his duty and marked the ballot as directed. This was prima facie evidence that Hatton voted as he said he did and there was no evidence to the contrary. This vote should have been deducted from Thomas.

3. There is one more vote of a different class which the contestant submits should have been deducted from the contestee. Walker Curtis was laboring under the disability of a convicted felon without restoration of his right of suffrage. He testified that he voted for Thomas but had left the secondary stub on his ballot bearing his name when he deposited it in the box. The presumption is that the election commissioners performed their duty and did not count the ballot for any one. There being no evidence to overcome the presumption that the vote was thrown out, the court properly refused to deduct it from Thomas.

## II.

1. We consider votes which the trial court deducted from the contestant, Everman, which he submits should not have been done.

(a) Patsy Marcum. The only evidence as to this person is that she voted the straight Republican ticket.

Some folks may think that was bad judgment. But that alone does not disqualify the voter. It was probably assumed that she was the wife and had lived with John Marcum, who was shown to have voted without right, but the case must be tried on the record. We think, therefore, this vote was erroneously deducted from Everman.

(b) Frances Hall, who had never lived in Powell County, married Dewey Hall in 1941. It seems that he was a native of Stanton but had been working in Ohio several years when he married. He went into the Army and his wife stayed in Ohio for awhile and then moved near an Army camp to be near her husband. She testified that when he came home in January, 1945, they decided to make their home in Powell County. They sent their furniture, or some of it, to his mother's home there. She came to Stanton in October, 1945, to live. Clearly she was not entitled to vote, for neither she nor her husband had established a residence in the county for six months or the precinct for 60 days before the election. The court properly deducted her vote.

(c) The testimony as to the identification of some of the precincts in which certain persons had voted was indefinite, e. g., the number of precinct in which the voter lived was stated and only the name of the precinct in which he voted was given. It is claimed that on this account the court was not authorized to conclude illegality. By uncontroverted pleading or evidence in reference to other voters, the identification of different precincts was established and the court properly deducted these votes, namely, Jim Dunaway, Mabel Johnson, John Pitts.

(d) Only one question was asked of Jessie Townsend and that was: "You are a brother of Troy, Leonard and Edmond Townsend, are you not?" It was not answered. It was established that those three men had voted out of their respective precincts, but it is nowhere shown that Jessie lived with any of them or where he voted. The court was not authorized to deduct a vote from the contestant on account of this man.

(e) Omer Hatton had gone to another precinct to make a crop, but returned to vote in the precinct in which he owned property, had lived all his life and had always voted. Arthur Wireman and his wife, Elsie, were living temporarily out of their home precinct while he was en-

gaged in drilling oil and gas wells. These votes were improperly deducted from the contestant.

(f) The division line between Clay City precinct No. 10 and Darlingsville precinct No. 15, is very indefinite and uncertain in and around Waltersville Postoffice. A line in the court order establishing the precinct reads: "Running with Tolin Hollow to the road." The line is perhaps a mile and a half long. Confusion has arisen over whether it runs straight or with the meanders of the hollow. From the testimony of witnesses who claimed to know the exact location of the line at this point it appears that Mrs. Emma Shoemaker, Walter A. Smith and his wife had voted in the wrong precinct for the contestant and the court deducted three votes from his total. These parties had been voting in the same place since the line was established. Where there is doubt about the precinct in which a voter is entitled to vote because of uncertainty in the location of the line, and his residence is in proximity to it, he may elect which precinct he will vote in and as long as he stands by that choice he cannot be successfully challenged. Stice v. Parsley, 217 Ky. 653, 290 S. W. 471. These three votes were erroneously deducted from Everman.

(g) It is shown that Ishmael Muncy and Pearl Maloney had voted in the wrong precincts. They testified they had left the stubs with their names attached to the ballots when they were deposited in the box. Two votes were deducted on this account. There is no evidence as to how the election commissioners had treated these defective ballots, and reliance must be had upon the presumption that they had done their duty and excluded them from the county and the returns. Therefore, it was error to deduct the votes again, so that two votes should be restored to the contestant's total.

(h) Mrs. C. H. Benningfield did not know whether she tore off the stub from her ballot or not. This evidence was not sufficient proof to justify the conclusion that it was an exposed ballot, and the court properly deducted it as she had voted out of her precinct.

(i) Mrs. Mallie Mae Barnett's father lived in Precinct No. 6. She had lived in Ohio four or five years and voted there in 1944. In March, 1945, she married a soldier, whose home was with his father, who also lived

in Precinct No. 6, but she remained in Ohio except when in Georgia near her husband while he was stationed there. She came to his father's home for the first time in August, 1945, and testified she had claimed that as her home. Her husband had been accidentally killed in Ohio in September, 1945. We think the court properly held Mrs. Barnett not to be a legal voter in the November, 1945, election.

(j) The question of the right of O. K. Matthews and his wife to vote is an important one as the decision may affect many others of his calling and in similar situations. He is a colored Methodist preacher and as such an itinerant. Methodist preachers are subject to the orders of the governing authority of their church with respect to location and removal. Ordinarily, they are assigned anew once a year whether returned to the same charge (which may be for an indefinite number of years) or to another church. In an emergency or on an extraordinary occasion the preacher may be moved between appointments. This relationship often results in the loss of the right to vote, for the usual time of changing in Kentucky seems to be in the fall of the year and often there is no residence in the county for six months before the day of election. In this case the Reverend Matthews for ten years had claimed as a permanent home the old home of his wife, who owned an interest in property there, subject to her mother's life estate. He and his wife had lived there at different times and continued to keep some of their furniture there. Last November he had been stationed at a church in Bath County for four years. Just before that assignment he had lived in Bourbon County and voted there, but before being sent to Bath County he had registered in Precinct No. 1 in Powell County. He testified that he had continued to vote there "because I intend to go back there if I am out of the ministry."

In law every person has a domicile, but only one for the purpose of exercising the right of suffrage. It may be different from his actual abode. Where a domicile has been once established it continues until the person renounces it and takes up another instead. The word "reside" as used in Section 145 of the Constitution, and "residence" as used in KRS 117.020, have always been construed to be equivalent to "legal domicile" as dis-

tinguished from the place of actual abode. Elan v. Maggard, 165 Ky. 733, 178 S. W. 1065. Residence for the purpose of voting means a place of fixed domicile, and carries with it the element of permanence; there must be the act of abiding, coupled with the intention of remaining and making the place one's home to the exclusion of other places. Intent may not be proved by mere declarations. The declarations are to be judged by the conduct of the party, and where there is a discrepancy they yield to the conclusions to be drawn from his acts. The intent with which a change in legal residence is made is to be determined from the character of the domicile, its object and purpose in connection with the other evidence in the case. The fact that a person intends or expects to remove at a future time according to developments does not necessarily defeat his residence before he actually does move. Therefore, a temporary abode for purposes of business, pleasure, or otherwise does not result in the loss of residence. 18 Am. Jur., Elections, Secs. 58, 59. But a person may establish his home for voting purposes at that place if he chooses although he has the intention of staying there a limited time. If, however, he shall have definitely and intentionally anchored himself to a given place by actually living there and having a bona fide purpose of returning and residing there permanently when his travels shall have ended or his temporary habitation abandoned, and if he has some substantial claim to the permanent place claimed, as, for example, his old home, and if throughout the period which followed the formation of such purpose he does nothing inconsistent therewith, he will have established a permanent legal residence. It was so held in relation to a preacher in Allgood v. Williams, 92 Ala. 551, 8 So. 722.

It is stated in McCreary on Elections, Sec. 105, that with reference to Methodist ministers and others whose lives are necessarily migratory or whose business is to travel from place to place a rule must be applied that is different from the general rule that in order to gain a residence in a particular place a man must fix his domicile there with the intention of remaining an indefinite time and with no fixed purpose of making that place a temporary abiding place only. The author bases his text on a report of the Committee on Elections of the House

of Representatives of the 42nd Congress, in the case of Cessna v. Myers,[1] which is published as an appendix. The report deals with an election contest. In the course of the opinion and report it is said in this connection: "A clergyman of the Methodist Church who is settled for two years may surely make his home for two years with his flock, although he means at the end of that period to remove and gain another." So the right of choice is recognized as between a minister's place of service and the establishment of a fixed and permanent legal residence. While this minister was not a native Kentuckian, because of his itinerancy he had chosen the home of his wife as their permanent home ten years before this election and while living there. We think, therefore, that he and his wife were entitled to vote in that precinct and that the trial court erroneously deducted two votes from Everman.

(k) The evidence was sufficient to show the following did not have the right to vote where they did, so that the court properly deducted them from the contestant, Everman, namely, Myrt Reed, Mrs. Bernice McIntosh, Becky Barnett, Cas Mullens, Herman Napier and Woodrow Bowen.

(l) John Oaks and wife who were living in Lexington where he was permanently employed seemed to have had only a "floating intention" to return to their former voting precinct in Powell County. That is not enough. Thompson v. Emmert, 242 Ky. 415, 46 S. W. 2d 502. Likewise, J. G. Thomas and wife had a very indefinite intention to return. These four votes were properly deducted from Everman.

(m) Walter Hoskins and wife had moved out of the county for the sole purpose of making a crop as tenants. They are in the same classification as Doyle Lyle and wife whom we found to be legal voters for Thomas in their old precinct. Therefore, these two votes should not have been deducted from Everman.

(n) Mrs. William Raybould had regarded her father's home in Precinct No. 2 as her home and was registered there while she was working elsewhere. In April, 1944, she married a soldier, whose legal residence

1. No opinion for publication.

was in No. 9. Both of them were registered in that precinct, and after he was released from the Army they went to live there sometime in September, 1945. We think the domicile of the husband under such circumstances became that of his wife (Price v. Judd, 169 Ky. 772, 185 S. W. 154), and that she was entitled to vote there, so it was error to deduct this vote from Everman.

(o) There is no merit in the contention of a failure to prove that Mickey Snowden, Margaret Snowden or Newt Rogers were not sworn before voting openly. The election officers in the respective precincts testified that no one was sworn. The court properly deducted these votes from Everman.

(p) Clay Centers could not say positively that the election officer marked his ballot for Everman as he directed. The presumption is that he did. As we have stated above in connection with the vote of Hatton, the court properly deducted this vote from Everman.

(q) As heretofore stated, the court erroneously deducted two votes from the appellant on account of the illegal method of voting by Matilda and May Spencer. Therefore, two votes should be added to Everman.

We have passed without a decision the complaint that the evidence failed to prove that Simpson Clemmons was an illegal voter and that the court improperly deducted his vote from Everman.

Our consideration of the points made by the appellant has come to an end. Summarizing, we have found that the court should have deducted two more votes from Thomas and that he had erroneously deducted 17 votes from Everman, which should be added to his total. The result thus far is to show Everman has a majority of 10 votes. This makes it necessary to consider the counter-charges of the appellee Thomas.

### III.

The contestee claims the court committed errors in improperly deducting the following from his total vote.

(1) We first consider voters questioned because of non-residence.

(a) Clayton Hall was formerly sheriff of Powell County and was the successful candidate in this election

for the same office. There is confusion in the location of his legal residence in a Clay City precinct (either No. 5 or No. 10) where he had been voting for 20 years. It arises from the fact that while living in Stanton during his previous term of office his house burned in his home precinct and he had had an actual abode elsewhere. But he had always had the intent and purpose of keeping his original voting place and of rebuilding his home when conditions permitted. The trial court ruled that he and his wife had no right to vote there and charged two votes to Thomas. Giving the voters the benefit of a doubt, we think this was error.

(b) Stanley Chaney was living with his father in Precinct No. 9 when he was inducted into the Army and continued to regard that as his home. While he was overseas his wife purchased a dwelling house in Precinct No. 2 and went there to live. He testified he had nothing to do with the removal. It appears that he returned home three days before the election and went to his wife and her home, but voted at his old precinct, No. 9, where some of his furniture had remained. There is doubt about this voter, but in the absence of more definite evidence of a permanent change in his legal residence, we hold that the court erroneously held him to be an illegal voter. This vote should be restored to Thomas.

(c) Lewis Crabtree testified he lived in North Fork Precinct and voted in South Fork No. 4. It is stipulated that his wife's testimony would be the same. There is no merit in the contention that the evidence fails to show that he voted out of the precinct in which he lived. The statement of appellee's counsel that there is no North Fork precinct is refuted by the allegations of his own answer and of the petition as well. The vote was properly charged up to Thomas.

(d) Pat Maloney testified that he voted for Thomas in Precinct No. 9. He had lived one mile out on the highway from Stanton for about four months. Asked if that was in No. 2 Precinct, he answered: "I guess it is," and further, "I don't know for sure." The record shows that both precincts bear the name of Stanton. The burden was on the contestant to prove the vote was an illegal one and he did not meet the burden. This vote should not have been deducted from Thomas.

(e) Frank Kennon and wife had lived and voted in Hardwick Precinct No. 6 for many years. When his term as County Tax Commissioner expired four years before, he had gone to work in a war plant in Madison County and for convenience had rented a room in Irvine where they lived. He was there temporarily for the duration of the war, with full expectation and intention of returning to their old home precinct to live. These votes, we think, were improperly deducted from Thomas and should be restored to his total.

(f) William Curtis and wife voted in Virden Precinct No. 1, as they had always done. They had been employed for several years at the Eastern State Hospital, at Lexington. The evidence shows a temporary absence, with a fixed intent to return to their home precinct when their employment by the State should end. These two votes should be restored to Thomas.

(g) Harrison Powell who voted in Darlingsville Precinct for Thomas was also employed at the State institution in Lexington. But he testified that he had no particular or definite intention of returning to his old precinct. He owns some land there but there is no dwelling house on it. He was not entitled to vote in that precinct and the court properly charged him to Thomas.

(h) Coin Bowen, a former County Judge, Tax Commissioner and Jailer, voted in Precinct No. 2. He moved to Lexington about three years before this election and was employed for awhile at the Government Depot at Avon, later by an electric company, and for the past 60 days before the election he "worked at the car trade." He sold his property in Stanton in the previous December, but had left some furniture stored in the precinct and some in another place. He testified that he regarded Powell County as his home and had always intended to return to his old precinct "some of these days; I don't know how soon, or when that will be." It is doubtful that this man had the right to vote in the county, but, giving him the benefit of the doubt, we have reached the decision that his vote should not have been deducted from Thomas.

(i) Ethel Dunaway voted for Thomas in the wrong precinct. Her husband, Jim Dunaway, had voted at the same place for Everman. We affirmed the circuit court

in deducting his vote. It was also proper to deduct Mrs. Dunaway from Thomas's total.

(j) Rodney Clark voted in Hardwick No. 6. He had been teaching in Stanton High School off and on for eight years. For the past 2½ years he had been rooming in the home of his stepmother in Stanton. He is 41 years old and unmarried. He has spent part of his time on his family's farm in his home precinct, No. 6. It must be held that his domicile of origin was retained and that Clark was a legal voter there. See Annotations, 37 A. L. R. 145. This vote should be added to Thomas's total.

(k) Nannie Scott may or may not have voted in the right precinct, No. 1, but there is no evidence as to how she voted in this race. Therefore, the court should not have charged her up to Thomas.

(l) Levi Combs, a Baptist preacher, moved to Madison County in May, 1945. He sold his property, except a part of the land, and bought a residence in Madison County and registered to vote there. He had gone there for the purpose of staying and building a church, but his plan did not work out. Then he sold that property and moved back to Slade. We cannot agree with the appellee's argument that his removal to Madison County was contingent on his building a church, and the contingency having failed that he should be regarded as having been in Madison County only temporarily. His intention was to stay there and he manifested it by his act. The court properly regarded him as having no right to vote in this election.

(m.) Sam Rhule had been living in Menifee County for more than two years, but voted in Stanton where he had actually lived and which he had regarded as his home since he was 16 years old. He is engaged in drilling oil wells and moves around from place to place. He never voted elsewhere and had never had the intention of abandoning Stanton as his place of permanent residence. We think he should be regarded as was Arthur Wireman, whom we held was a legal voter. Rhule's wife is in the same category. Therefore, the court improperly deducted these two votes from Thomas.

(n) Burley Stamper voted in Bowen Precinct No. 1, where his parents lived and where he had lived all

his life, when he went into the Army in 1942. At that time his wife was living in Perry County. When he returned from the service on October 28, 1945, she had been living in Lexington about two months. The witness was evasive concerning the relationship existing between himself and his wife. He testified that she was in Lexington temporarily. It may be deduced that they were separated. We do not think the evidence sufficient to prove Stamper was an illegal voter; hence the court improperly deducted him from Thomas.

2. We consider voters who voted openly without being sworn as to their disabilities, for which deductions were made from Thomas.

(a) George W. Brooks, Mrs. Lizzie Strange and Steve Strange had told the election officers in their respective precincts to mark their ballots for Thomas, but none of them could say that they had actually done so. The presumption is that the officers did as directed, so the court properly deducted these votes.

(b) Zach Barnes and wife voted in Precinct No. 11. Neither testified for whom they had voted. One election officer testified they voted for Thomas and the other officer that they voted for Everman. As the trial court had observed the witnesses and ruled that these votes should be charged against Thomas, we shall accept and concur in that decision.

(c) Ben Townsend voted across the table for Thomas, but there was no testimony to the effect that the oath was not administered to him. The presumption is that it was. Therefore, on the record the court improperly charged him up to Thomas.

(d) Vina Powell did not testify, but an election officer testified that he had marked her ballot for Thomas. Then he contradicted himself by saying that she had voted in three other races only. We accept the decision of the trial court that it was proved she voted for Thomas.

(e) Eliza King voted openly without an oath. There is no allegation in contestant's pleading that she was an illegal voter. Therefore, the court was not authorized to deduct a vote from Thomas on her account.

## IV.

At this stage we find that the contestee Thomas has a majority of 6. It is not necessary, therefore, to consider the ruling of the trial court as to 10 votes which the contestee claims the court erroneously refused to deduct from the contestant. Nor is it necessary to consider the vote cast by Simpson Clemmons, which the contestant claims the court erroneously deducted from him, and about which ruling we have some doubt. We also pass without a decision the contestant's claim with respect to the way in which a certain ballot was marked, because of which it appears the election commissioners did not count it for the contestant.

The appellant questions the right of the appellee to have this court review errors claimed by him in the proceeding because he has not prosecuted a cross-appeal. It appears we have not heretofore passed upon this point, although there are many cases in which such consideration was given without the question being raised. It has often been said that the same rules apply in the practice of an election contest as in other cases except as otherwise specifically provided. The appeal submits the ultimate question: Is the judgment that the appellee was elected erroneous? The appellant says it is. The appellee says it is not. He seeks no affirmative relief. The appeal presents questions not unlike one involving an action for an accounting where we consider the various items considered by the circuit court in determining whether the plaintiff is entitled to recover an indebtedness. In an election contest, one party may take advantage of the plea of his adversary respecting disqualification of voters or the illegal manner of voting. Drennan v. Roberts, 234 Ky. 574, 28 S. W. 2d 735. In the personal injury case of Clark v. Wells-Elkhorn Coal Co., 215 Ky. 128, 284 S. W. 91, the circuit court had stricken certain affirmative defenses from the answer. The verdict and judgment were for the defendant on other issues, and the plaintiff appealed. We reversed the judgment because of the admission of incompetent evidence prejudicial to the plaintiff, and in the course of the opinion stated that the court had committed an error in striking one of the affirmative pleas. There was no cross-appeal. We pointed out that the appellee was not deprived of the right to rely upon errors committed

against it during the trial by the interlocutory orders, since he could not appeal from them, and that he could not appeal from the final judgment which was in his favor, so it was not necessary that he obtain a cross-appeal in order to have such errors reviewed, a cross-appeal being maintainable only when the effect of the final judgment is to place some obligation on the appellee.

In 29 C. J. S., Elections, sec. 314, it is said: ''A respondent or appellee may urge any facts appearing in the record which will support the judgment of the court below.''

We do not think it was necessary that the appellee prosecute a cross-appeal to have a review of the rulings adverse to him of the same character as those complained of by the appellant. It may be otherwise where a ground relied on by an appellee, in case the appellant's contentions should be sustained, which is of a different class, e. g., a claim that the court had erred in denying his plea of a violation of the corrupt practices act by the appellant.

Our conclusion is that the contestant, Everman, has not established his right to the office, and that the judgment that the contestee, Thomas, was duly elected should be, and it is affirmed.